**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bolivar O. PALACIOS–MOLINA,
Defendant–Appellant.**

**No. 92–2887.**

United States Court of Appeals,
Fifth Circuit.

Oct. 27, 1993.

---

**50**

Roland E. Dahlin, Federal Public Defender, Thomas S. Berg, First Asst. Federal Public Defender, Houston, TX, for defendant-appellant.

Paula C. Offenhauser, Asst. U.S. Atty., Ronald G. Woods, U.S. Atty., Houston, TX, for plaintiff-appellee.

Before JOHNSON, WIENER, and DeMOSS, Circuit Judges.

JOHNSON, Circuit Judge:

Defendant–Appellant Bolivar O. Palacios–Molina ("Mr. Palacios") pled guilty to possession with the intent to distribute more than 500 grams of cocaine. At sentencing, however, Mr. Palacios objected to the inclusion of the weight of the carrier liquid in which the cocaine was distilled in the drug quantity calculation. The district court overruled this objection, though. As we conclude that the weight of the transport liquid should not have been included in the quantity calculation, we reverse.

## FACTS AND PROCEDURAL HISTORY

Mr. Palacios was arrested at the Houston Intercontinental Airport when customs inspectors discovered powdered cocaine in two aerosol cans he was carrying. Further, the inspectors discovered two one-and-a-half liter bottles of "Yago Sangria" which contained a thick liquid which proved to have cocaine distilled in it.

As a result of a plea bargain, Mr. Palacios pled guilty to possession with the intent to distribute in excess of 500 grams of cocaine.[1] At sentencing, however, Mr. Palacios objected to the drug quantity calculation because it included both the weight of the powdered cocaine from the aerosol cans and the *entire* weight of the liquid in the two bottles. This gross weight was 4,328.7 grams and equated to a base offense level of 30. Instead, Mr. Palacios asserted that the weight of the waste liquid in the bottles should have been excluded. This would produce a weight of 3,456.2 grams and equate to an offense level of 28.

The district court overruled this objection, though, and sentenced Mr. Palacios based on the greater weight. This led to the imposition of a sentence of 70 months' imprisonment, a five-year term of supervised release and a $500.00 cost assessment. Mr. Palacios timely appealed this sentence.

---

1. 21 U.S.C. § 841(a)(1).

## DISCUSSION

■ The facts in this case are not disputed. Instead, this appeal challenges the district court's application of the Federal Sentencing Guidelines to those facts. Our review of the district court's application of the Guidelines is *de novo*. *United States v. Anderson*, 987 F.2d 251, 257 (5th Cir.1993).

■ The issue in this appeal is whether, in calculating the weight of cocaine for sentencing purposes, the weight of the transport medium should be included. The starting point for analyzing this issue is U.S.S.G. § 2D1.1, Drug Quantity Table (November, 1992). That section of the Sentencing Guidelines states that "the weight of a controlled substance ... refers to the entire weight of any *mixture or substance* containing a detectable amount of the controlled substance." *Id.* (emphasis added). Thus, the issue reduces to whether the liquid in the bottles herein was a "mixture or substance" within the meaning of § 2D1.1.

This section was recently discussed by the Supreme Court in *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). In *Chapman*, the drug at issue was LSD which, for the purposes of sale, is sprayed onto blotter paper. Squares of this paper are then sold and the drug is ingested by either eating or licking the paper or by dropping the paper into a beverage where the coating dissolves and the drug is released. *Id.* at ——, 111 S.Ct. at 1923. Chapman argued that the weight of the blotter paper should not have been included in the weight calculation. Instead, Chapman alleged that the weight of the pure LSD should have determined sentencing.

The Supreme Court disagreed. In so doing, the Court observed that Congress had "adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Id.* at ——, 111 S.Ct. at 1925. The blotter paper met this analysis. Though it diffused the LSD and thus decreased the drug's purity, the paper was part of the total quantity of what was marketed. Further, the Supreme Court noted that the LSD/blotter paper material met the dictionary definition of the term "mixture." Hence, the Court held that this was a mixture within the meaning of § 2D1.1 and thus the weight of the paper was includible in the quantity calculation. *Id.* at ——, 111 S.Ct. at 1929.[2]

The *Chapman* decision did not end the uncertainty, however, with regard to the precise issue in the present case. *Chapman* involved a carrier medium. With LSD, some form of carrier medium is needed to facilitate the marketing and distribution of the drug. The present case involves a transport medium, though. Its function is merely transportation and concealment and it is removed from the drug before it is marketed.[3] In addressing this precise issue, the Circuits have split. *See Walker v. United States*, —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992) (White, J., dissenting from the denial of certiorari review).

On one side, as to cocaine, stands the First Circuit. In *United States v. Mahecha–Onofre*, 936 F.2d 623 (1st Cir.1991), that Court held that the weight of the transport medium should be included in the quantity calculation. In that case, smugglers tried to

2. *See also United States v. Taylor*, 868 F.2d 125, 127–28 (5th Cir.1989) (weight of the distribution medium is included in calculating the weight of LSD).

3. The government suggests that the cocaine need not have been separated from the liquid, but rather, it was usable and marketable in its aqueous form. The genesis of this argument is the dissent by Judge Van Graafeiland in *United States v. Acosta*, 963 F.2d 551 (2d Cir.1992). In his dissent, the Judge recounts that in the late 19th Century, before cocaine was branded a controlled substance, it was distilled in many differ-

ent types of liquids and marketed in that form for its exhilarative and medicinal qualities. *Id.* at 558 (Van Graafeiland, J., dissenting). While this may be true, this is not the way that illicit cocaine is marketed today. In today's market, the transport liquid is separated from the drug powder and its cutting agents. This separated liquid is simply waste liquid. *United States v. Rolande-Gabriel*, 938 F.2d 1231, 1237 (11th Cir.1991). Moreover, as Mr. Palacios was also found with a quantity of powdered cocaine, it seems clear that the cocaine he was carrying was not intended to be marketed as a liquid. Thus, we find no merit in this argument.

import cocaine by mixing it with the acrylic material in a suitcase. Citing *Chapman*, the Court found that, even though the cocaine had to be separated from the acrylic material before use, this substance met the "ordinary meaning" of the term mixture. Accordingly, the Court upheld a sentence which included the weight of the entire suitcase minus its metal parts. *Id.* at 626.[4]

On the other side of the split are the Second, Eleventh, Third and Ninth Circuits.[5] Illustrative of these cases is *United States v. Acosta* where the Second Circuit held that the weight of the creme liqueur in which cocaine was distilled should not be included in the weight calculation. 963 F.2d 551 (2d Cir.1992). To support this holding, the Court seized on the "market-oriented" language in *Chapman*. Accordingly, the Court argued that Congress was concerned with usable drugs on the market. However, the liqueur in *Acosta* had to be removed from the drug before use. It was not marketed with the cocaine and was not ingestible, but rather, it was merely used for transportation and concealment. Thus, the Second Circuit held

that the liqueur was merely liquid waste and the functional equivalent of packaging material which the *Chapman* Court found not to be includible in the quantity calculation.[6] *Id.* at 554.

The Fifth Circuit has not faced this specific issue of what constitutes a mixture with the drug cocaine. It has, however, decided this issue with regard to the drug methamphetamine. In several cases, this Circuit has held that toxic liquid byproducts from the manufacture of methamphetamine that contain trace quantities of the drug are "mixtures" within the meaning of § 2D1.1. Thus, the gross weight of these liquids is includible in the weight calculation for sentencing.[7] The government argues that these decisions with regard to methamphetamine byproducts resolve this issue as to transport mediums with cocaine as well.

Mr. Palacios contends, however, that we should, on the strength of the market-oriented analysis set forth in *Chapman*, hold that unusable waste liquids in connection with the trafficking of cocaine should not be included

4. *See also, United States v. Lopez–Gil*, 965 F.2d 1124 (1st Cir.1992) (entire weight of cocaine/fiberglass mixture making up a suitcase included); *United States v. Restrepo–Contreras*, 942 F.2d 96 (1st Cir.1991) (cocaine mixed with beeswax and sculptured into a statue is a mixture).

5. *See e.g. United States v. Salgado–Molina*, 967 F.2d 27, 29 (2d Cir.1992) (weight of liqueur in which cocaine was distilled should not be included in weight calculation); *United States v. Rolande–Gabriel*, 938 F.2d 1231, 1237 (11th Cir. 1991) (unusable liquids in a transport mixture in the trafficking of cocaine should not be included in the weight calculation); *United States v. Bristol*, 964 F.2d 1088 (11th Cir.1992) (weight of wine in which cocaine was distilled should not be included in weight calculation); *United States v. Rodriguez*, 975 F.2d 999, 1007 (3rd Cir.1992) (cocaine layered on top of boric acid and compressed into a brick not a mixture); *United States v. Robins*, 967 F.2d 1387, 1389 (9th Cir.1992) (cornmeal and cocaine not a mixture because they are easily distinguishable, cornmeal is not a diluent, and the cornmeal had to separated out before the cocaine could be effectively used).

6. To resolve this split in authority, the Federal Sentencing Guidelines Commission has recently proposed amendments to the comments of the Guidelines worded as follows:

Mixture or substance does not include materials that must be separated from the controlled

substance before the controlled substance can be used. Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statue, and waste water from an illicit laboratory used to manufacture a controlled substance.

58 Fed.Reg. 27148–01 (1993) (proposed April 29, 1993). This amended commentary comes too late to directly help Mr. Palacios as it was not yet proposed at the time he was sentenced. 18 U.S.C. § 3553(a)(4) and (5) (sentencing decisions made based on the Guidelines in effect at the time defendant sentenced). However, it is at least persuasive authority as to the meaning of the term "mixture" that the Guidlines Commission intended under the Guidelines in effect when Mr. Palacios was sentenced.

7. *See, e.g., United States v. Anderson*, 987 F.2d 251, 258 (5th Cir.1993); *United States v. Ruff*, 984 F.2d 635, 640 (5th Cir.1993); *United States v. Walker*, 960 F.2d 409, 412 (5th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992); *United States v. Sherrod*, 964 F.2d 1501, 1509–10 (5th Cir.), cert. dismissed, —— U.S. ——, 113 S.Ct. 834, 122 L.Ed.2d 111 (1992); *United States v. Mueller*, 902 F.2d 336, 345 (5th Cir.1990); *United States v. Butler*, 895 F.2d 1016, 1018 (5th Cir.1989), cert. denied 498 U.S. 826, 111 S.Ct. 82, 112 L.Ed.2d 54 (1990); *United States v. Baker*, 883 F.2d 13, 15 (5th Cir.), cert. denied, 493 U.S. 983, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989).

in the weight calculation for sentencing. Further, he argues that such a holding would not be contrary to our methamphetamine rulings because they are distinguishable in that *Chapman* did not apply to methamphetamine.

Studying *Chapman*, we note that the Supreme Court embarked on its market-oriented analysis only after specifically recognizing that the drugs methamphetamine and PCP were singled out for different treatment under the Guidelines.[8] *Chapman*, —— U.S. at ——, 111 S.Ct. at 1924. Thus, it would appear that the market-oriented analysis was not intended to apply to methamphetamine or PCP.

In fact, this Circuit has recognized as much. In *United States v. Sherrod*, 964 F.2d at 1510, this Court reaffirmed its methamphetamine decisions, but only after it specifically concluded that the *Chapman* market-oriented reasoning did not apply to methamphetamine.[9] Further, this Court stated in *United States v. Walker* that

> *Chapman* did not involve methamphetamine; nor did it involve a liquid. Hence, the Court did not speak to the issue of whether the weight of liquid waste containing methamphetamine should serve as a basis for computing a defendant's offense level.

960 F.2d at 412.

Moreover, there are rational reasons, aside from their disparate treatment under the Guidelines and under *Chapman*, to distinguish the liquid waste in the instant case and the liquid waste in the manufacture of methamphetamine. In the case at bar, the liquid in the wine bottles was an otherwise innocuous liquid. Its only purpose was to conceal the drug during transportation. By contrast, the liquids involved in the methamphetamine cases were either precursor chemicals or by-products of the manufacturing process. These are not otherwise innocuous liquids. Rather, they are necessary to the manufacturing and thus the ultimate distribution of the controlled substance. *United States v. Robins*, 967 F.2d 1387, 1390 (9th Cir.1992).

Accordingly, our decisions with regard to methamphetamine should not dictate a result in this case. There are rational reasons to distinguish between methamphetamine by-products and the liquid waste in this case. Further, in light of the Sentencing Commission's recent proposed amendments submitted to Congress,[10] we see no reason to extend our methamphetamine holdings to waste liquids in cocaine trafficking as this has already become superseded law.[11] Lastly, *Chapman's* market-oriented analysis does not apply to methamphetamine. It does, however, apply to cocaine.

Thus, we proceed unfettered by precedent as we consider whether under the market-oriented analysis of *Chapman* waste liquid in which cocaine is distilled for transport is part of a mixture within the meaning of § 2D1.1. We find that it is not and in so doing, we follow the lead of the Second, Eleventh, Third and Ninth Circuits.

■ Congress' concern was with the amount of usable, consumable mixtures, whether pure or impure, that will eventually reach the streets. *Rodriguez*, 975 F.2d at 1006. To promote the goal of reducing the amount of usable drug mixtures reaching the streets, Congress adopted an approach to punishing drug trafficking that is market-oriented. *Chapman*, —— U.S. at ——, 111 S.Ct. at 1925. Under this approach, punishments are based on the "total quantity of what is *distributed*, rather than the amount of pure drug involved …" *Id.* (emphasis added). Moreover, this quantity is the

---

8. For these two drugs, sentencing based on either the weight of the pure drug or on the weight of a mixture containing the drug is allowed. For other drugs, including cocaine and LSD, only sentencing based on the weight of a mixture is allowed. U.S.S.G. § 2D1.1, Drug Quantity Table (November 1992).

9. *See also, United States v. Eastland*, 989 F.2d 760, 768 (5th Cir.1993); *but see, United States v. Jennings*, 945 F.2d 129, 136–37 (6th Cir.1991)

(applying the market-oriented analysis in a methamphetamine case).

10. 58 Fed.Reg. 27148–01, *supra* note 6.

11. *See Stinson v. U.S.*, —— U.S. ——, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (holding that the commentary to the Guidelines is authoritative, even before reviewed by Congress).

" 'street weight' of the drugs in the diluted form in which they are sold ..." *Id.,* —— U.S. at ——, ——, 111 S.Ct. at 1927–28.

In *Chapman,* the blotter paper was part of the usable substance that was to be distributed on the market. It decreased the purity of the LSD and increased the bulk of the noxious material to be distributed. This is very different from the case before us, though. Here, the liquid in which the cocaine was distilled was not to be marketed as part of a usable substance with the drug. Rather, it had to be removed before the drug was marketed. It affected neither the purity nor the bulk of the substance that was to be marketed. Though this liquid/cocaine substance probably met the ordinary definition of the term mixture, it was not a usable mixture that would ever reach the streets.

Under the market-oriented approach, the issue is marketability. *Acosta,* 963 F.2d at 555. Accordingly, sentencing decisions should be based on the amount of marketable drug mixtures trafficked, however pure. *Id.* The cocaine in the present case was not a usable substance while it was mixed with the liquid in the bottles. Only after the liquid was distilled out would it be ready for either the wholesale or retail market. *Acosta,* 963 F.2d at 555. Thus, as this liquid was not part of a marketable mixture, it is not implicated under the market-oriented analysis in *Chapman* and should not have been considered part of a mixture for determining drug quantities under § 2D1.1.

Rather, the liquid in the wine bottles in this case was akin to the packaging material found not to be includible in *Chapman,* —— U.S. at ——, 111 S.Ct. at 1926. As with any normal container, the cocaine here was placed into the liquid for transportation and would be separated out before use. Moreover, it was easily distinguishable from and separable from the cocaine. *Rolande–Gabriel,* 938 F.2d at 1237. Thus, it was the functional equivalent of packaging material. *Robins,* 967 F.2d at 1389.

Additionally, to hold that this liquid is a mixture for § 2D1.1 purposes would lead to unjust results. It is fundamentally unfair to punish someone who trafficks in the same amount and purity of cocaine as another more severely simply because he chose to distill his cocaine in ten gallons of water whereas the other chose to distill his cocaine in only five gallons. When the respective individuals separate their cocaine from the water, the same amount of usable drug mixtures will be marketed by each individual and thus the same amount of societal evil will be done. *See* 28 U.S.C. § 991(b)(1)(B) (Sentencing Commission established to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct ...").

Lastly, the government points to certain language in the *Chapman* decision to the effect that the blotter paper makes the LSD "easier to transport, store, conceal, and sell." *Chapman,* —— U.S. at ——, 111 S.Ct. at 1928. Further, the *Chapman* Court referred to the blotter paper as a "tool of the trade for those who traffic in [LSD]." *Id.* In like manner, the government argues that the liquid transport medium here was a "tool of the trade" that made the cocaine "easier to transport, store, conceal, and sell."

We do not find this argument convincing because it misses the basic point. The yardstick by which culpability is measured in drug trafficking cases is the *amount* of the commodity (usable drug mixtures) that the defendant moves in the chain of distribution. The government's argument ignores this. Instead, this argument describes *how* the defendant moves the drugs and not *how much* of the commodity the defendant moves. *Acosta,* 963 F.2d at 556. For sentencing purposes, the method of transporting the drugs is unimportant. Rather, it is the amount of that commodity trafficked that counts. Thus, the government's argument fails.

## CONCLUSION

We believe that in light of Congress' market-oriented approach, culpability must be based on the amount of usable drug mixtures that the defendant brings to the market. *Id.* at 557. Here, the liquid transport medium in the wine bottles was to be separated out

before distribution. Thus, it was not a part of the usable drug mixture that would reach the market. Accordingly, the substance in the wine bottles in this case was not a mixture within the meaning of § 2D1.1 and therefore the weight of the waste liquid should not have been included in the quantity calculation for sentencing purposes.

REVERSED AND REMANDED.